NATE L. CRABTREE, Respondent, *v.* ELIZABETH ARDEN SALES CORPORATION, Appellant.

Submitted November 25, 1952; decided January 21, 1953.

*J. Howard Carter, John R. Schoemer, Jr., John J. Macchia* and *Arthur W. Knapp, Jr.,* for appellant. I. There is no written memorandum of plaintiff's alleged contract of employment sufficient to satisfy the Statute of Frauds. (*Carter, Macy Co.* v. *Matthews,* 220 App. Div. 679; *Brauer* v. *Oceanic Steam Navigation Co.,* 178 N. Y. 339; *Friedman & Co.* v. *Newman,* 255 N. Y. 340; *Standard Oil Co.* v. *Koch,* 260 N. Y. 150; *United Press* v. *New York Press Co.,* 164 N. Y. 406; *Culotta* v. *Banana Sales Corp.,* 142 Misc. 149; *Watson* v. *Gugino,* 204 N. Y. 535; *Martin* v. *New York Life Ins. Co.,* 148 N. Y. 117; *Miller* v. *Burlington Mills Ribbon Corp.,* 304 N. Y. 600; *Mesibov, Glinert & Levy* v. *Cohen Bros. Mfg. Co.,* 245 N. Y. 305.) II. The court below adopted an erroneous measure of damages. (*Toplitz* v. *Ullman,* 2 Misc. 130; *Griffin* v. *Oklahoma Nat. Gas Corp.,* 132 Kan. 843.)

*Frank A. Fritz, Frank H. Platt, George Q. Slocum* and *Anthony T. Antinozzi* for respondent. I. Plaintiff's employment was for a definite term and did not constitute an employ-

ment at will. (*Braxton* v. *Mendelson*, 233 N. Y. 122; *Ferguson* v. *De Witt*, 230 App. Div. 778; *Fellows* v. *Fairbanks Co.*, 205 App. Div. 271; *Aerated Products Co.* v. *Godfrey*, 290 N. Y. 92; *Matter of Aurelio* [*Cohen*], 291 N. Y. 176; *Drivas* v. *Lekas*, 292 N. Y. 204; *Gressing* v. *Musical Instrument Sales Co.*, 222 N. Y. 215; *Mason* v. *New York Produce Exch.*, 127 App. Div. 282; *Breakey* v. *Lake Placid Co.*, 271 App. Div. 586.) II. The contract of employment is evidenced by writings which together constitute a sufficient memorandum in compliance with the Statute of Frauds. (*Marks* v. *Cowdin*, 226 N. Y. 138; *Spiegel* v. *Lowenstein*, 162 App. Div. 443; *Raubitschek* v. *Blank*, 80 N. Y. 478; *Webster* v. *Zielly*, 52 Barb. 482; *General Overseas Corp.* v. *Republic Pictures Int. Corp.*, 74 F. Supp. 698; *Baxter* v. *Lustberg*, 205 App. Div. 673; *Doughty* v. *Manhattan Brass Co.*, 101 N. Y. 644; *Coe* v. *Tough*, 116 N. Y. 273; *Delaware Mills* v. *Carpenter Bros.*, 200 App. Div. 324; *Atlas Shoe Co.* v. *Lewis*, 202 App. Div. 244.) III. Plaintiff exercised reasonable care to mitigate damages. There was no abandonment of the employment or waiver of defendant's breach. (*Whitmarsh* v. *Littlefield*, 46 Hun 418; *Colloraff* v. *Hickson, Inc.*, 159 N. Y. S. 177; *Milage* v. *Woodward*, 186 N. Y. 252; *Howard* v. *Daly*, 61 N. Y. 362; *Bassett* v. *French*, 10 Misc. 672; *Fuchs* v. *Koerner*, 107 N. Y. 529; *Briscoe* v. *Litt*, 19 Misc. 5; *McClelland* v. *Climax Hosiery Mills*, 252 N. Y. 347; *Toplitz* v. *Ullman*, 2 Misc. 130; *Richardson* v. *Hartmann*, 68 Hun 9.) IV. Plaintiff is entitled prima facie to the amount of the unpaid salary for the unexpired term of the contract. (*Karas* v. *H. R. Laboratories*, 271 App. Div. 530, 297 N. Y. 494; *Hollwedel* v. *Duffy-Mott Co.*, 263 N. Y. 95; *Milage* v. *Woodward*, 186 N. Y. 252; *Sinclair* v. *Positype Corp. of America*, 237 App. Div. 525; *Howard* v. *Daly*, 61 N. Y. 362; *Van Wyck* v. *Mannino*, 256 App. Div. 256; *Preager* v. *Unity Shoemakers Corp.*, 257 App. Div. 632.)

Fuld, J. In September of 1947, Nate Crabtree entered into preliminary negotiations with Elizabeth Arden Sales Corporation, manufacturers and sellers of cosmetics, looking toward his employment as sales manager. Interviewed on September 26th, by Robert P. Johns, executive vice-president and general manager of the corporation, who had apprised him of the possible opening, Crabtree requested a three-year contract at

$25,000 a year. Explaining that he would be giving up a secure well-paying job to take a position in an entirely new field of endeavor — which he believed would take him some years to master — he insisted upon an agreement for a definite term. And he repeated his desire for a contract for three years to Miss Elizabeth Arden, the corporation's president. When Miss Arden finally indicated that she was prepared to offer a two-year contract, based on an annual salary of $20,000 for the first six months, $25,000 for the second six months and $30,000 for the second year, plus expenses of $5,000 a year for each of those years, Crabtree replied that that offer was " interesting ". Miss Arden thereupon had her personal secretary make this memorandum on a telephone order blank that happened to be at hand:

> " EMPLOYMENT AGREEMENT WITH
> NATE CRABTREE          Date Sept 26–1947
>    At 681—5th Ave          6: PM
>                *    *    *
>
> Begin                       20000.
> 6 months                 25000.
> 6    "                        30000.
>            5000.—per year
>                 Expense money
>
> [2 years to make good]
>
> Arrangement with
>    Mr Crabtree
> By Miss Arden
> Present Miss Arden
>                Mr John
>                Mr Crabtree
>                Miss OLeary "

A few days later, Crabtree 'phoned Mr. Johns and telegraphed Miss Arden; he accepted the " invitation to join the Arden organization ", and Miss Arden wired back her " welcome ". When he reported for work, a " pay-roll change " card was made up and initialed by Mr. Johns, and then forwarded to the payroll department. Reciting that it was prepared on September 30, 1947, and was to be effective as of October 22d, it

specified the names of the parties, Crabtree's " Job Classification " and, in addition, contained the notation that " This employee is to be paid as follows:

" First six months of employment     $20,000. per annum
   Next six months of employment     25,000.  "     "
   After one year of employment      30,000.  "     "
                        Approved by  RPJ [initialed] "

After six months of employment, Crabtree received the scheduled increase from $20,000 to $25,000, but the further specified increase at the end of the year was not paid. Both Mr. Johns and the comptroller of the corporation, Mr. Carstens, told Crabtree that they would attempt to straighten out the matter with Miss Arden, and, with that in mind, the comptroller prepared another " pay-roll change " card, to which his signature is appended, noting that there was to be a " Salary increase " from $25,000 to $30,000 a year, " per contractual arrangements with Miss Arden ". The latter, however, refused to approve the increase and, after further fruitless discussion, plaintiff left defendant's employ and commenced this action for breach of contract.

At the ensuing trial, defendant denied the existence of any agreement to employ plaintiff for two years, and further contended that, even if one had been made, the statute of frauds barred its enforcement. The trial court found against defendant on both issues and awarded plaintiff damages of about $14,000, and the Appellate Division, two justices dissenting, affirmed. Since the contract relied upon was not to be performed within a year, the primary question for decision is whether there was a memorandum of its terms, subscribed by defendant, to satisfy the statute of frauds (Personal Property Law, § 31).[1]

Each of the two payroll cards — the one initialed by defendant's general manager, the other signed by its comptroller — unquestionably constitutes a memorandum under the statute. That they were not prepared or signed with the intention of evidencing the contract, or that they came into existence subse-

---

1. While our opinion is limited to treatment of that question, we have, of course, considered the other points argued.

quent to its execution, is of no consequence (see *Marks* v. *Cowdin,* 226 N. Y. 138, 145; *Spiegel* v. *Lowenstein,* 162 App. Div. 443, 448–449; see, also, Restatement, Contracts, §§ 209, 210, 214); it is enough, to meet the statute's demands, that they were signed with intent to authenticate the information contained therein and that such information does evidence the terms of the contract. (See *Marks* v. *Cowdin, supra,* 226 N. Y. 138; *Bayles* v. *Strong,* 185 N. Y. 582, affg. 104 App. Div. 153; *Spiegel* v. *Lowenstein, supra,* 162 App. Div. 443, 448; see, also, 2 Corbin on Contracts [1951], pp. 732–733, 763–764; 2 Williston on Contracts [Rev. ed., 1936], pp. 1682–1683.) Those two writings contain all of the essential terms of the contract — the parties to it, the position that plaintiff was to assume, the salary that he was to receive — except that relating to the duration of plaintiff's employment. Accordingly, we must consider whether that item, the length of the contract, may be supplied by reference to the earlier unsigned office memorandum, and, if so, whether its notation, '' 2 years to make good '', sufficiently designates a period of employment.

The statute of frauds does not require the '' memorandum * * * to be in one document. It may be pieced together out of separate writings, connected with one another either expressly or by the internal evidence of subject matter and occasion ''. (*Marks* v. *Cowdin, supra,* 226 N. Y. 138, 145; see, also, 2 Williston, *op. cit.,* p. 1671; Restatement, Contracts, § 208, subd. [a].) Where each of the separate writings has been subscribed by the party to be charged, little if any difficulty is encountered. (See, e.g., *Marks* v. *Cowdin, supra,* 226 N. Y. 138, 144–145.) Where, however, some writings have been signed, and others have not — as in the case before us — there is basic disagreement as to what constitutes a sufficient connection permitting the unsigned papers to be considered as part of the statutory memorandum. The courts of some jurisdictions insist that there be a reference, of varying degrees of specificity, in the signed writing to that unsigned, and, if there is no such reference, they refuse to permit consideration of the latter in determining whether the memorandum satisfies the statute. (See, e.g., *Osborn* v. *Phelps,* 19 Conn. 63; *Hewitt Grain & Provision Co.* v. *Spear,* 222 Mich. 608.) That conclusion is based upon a construc-

tion of the statute which requires that the connection between the writings and defendant's acknowledgment of the one not subscribed, appear from examination of the papers alone, without the aid of parol evidence. The other position — which has gained increasing support over the years — is that a sufficient connection between the papers is established simply by a reference in them to the same subject matter or transaction. (See, e.g., *Frost* v. *Alward,* 176 Cal. 691; *Lerned* v. *Wannemacher,* 91 Mass. 412.) The statute is not pressed '' to the extreme of a literal and rigid logic '' (*Marks* v. *Cowdin, supra,* 226 N. Y. 138, 144), and oral testimony is admitted to show the connection between the documents and to establish the acquiescence, of the party to be charged, to the contents of the one unsigned. (See *Beckwith* v. *Talbot,* 95 U. S. 289; *Oliver* v. *Hunting,* 44 Ch. D. 205, 208–209; see, also, 2 Corbin, *op. cit.,* §§ 512–518; cf. Restatement, Contracts, § 208, subd. [b], par. [iii].)

The view last expressed impresses us as the more sound, and, indeed — although several of our cases appear to have gone the other way (see, e.g., *Newbery* v. *Wall,* 65 N. Y. 484; *Wilson* v. *Lewiston Mill Co.,* 150 N. Y. 314) — this court has on a number of occasions approved the rule, and we now definitively adopt it, permitting the signed and unsigned writings to be read together, provided that they clearly refer to the same subject matter or transaction. (See, e.g., *Peabody* v. *Speyers,* 56 N. Y. 230; *Raubitschek* v. *Blank,* 80 N. Y. 478; *Peck* v. *Vandemark,* 99 N. Y. 29; *Coe* v. *Tough,* 116 N. Y. 273; *Delaware Mills* v. *Carpenter Bros.,* 235 N. Y. 537, affg. 200 App. Div. 324.)

The language of the statute — '' Every agreement * * * is void, unless * * * some note or memorandum thereof be in writing, and subscribed by the party to be charged '' (Personal Property Law, § 31) — does not impose the requirement that the signed acknowledgment of the contract must appear from the writings alone, unaided by oral testimony. The danger of fraud and perjury, generally attendant upon the admission of parol evidence, is at a minimum in a case such as this. None of the terms of the contract are supplied by parol. All of them must be set out in the vari-

ous writings presented to the court, and at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged, while the unsigned document must on its face refer to the same transaction as that set forth in the one that was signed. Parol evidence — to portray the circumstances surrounding the making of the memorandum — serves only to connect the separate documents and to show that there was assent, by the party to be charged, to the contents of the one unsigned. If that testimony does not convincingly connect the papers, or does not show assent to the unsigned paper, it is within the province of the judge to conclude, as a matter of law, that the statute has not been satisfied. True, the possibility still remains that, by fraud or perjury, an agreement never in fact made may occasionally be enforced under the subject matter or transaction test. It is better to run that risk, though, than to deny enforcement to all agreements, merely because the signed document made no specific mention of the unsigned writing. As the United States Supreme Court declared, in sanctioning the admission of parol evidence to establish the connection between the signed and unsigned writings. " There may be cases in which it would be a violation of reason and common sense to ignore a reference which derives its significance from such [parol] proof. If there is ground for any doubt in the matter, the general rule should be enforced. But where there is no ground for doubt, its enforcement would aid, instead of discouraging, fraud." (*Beckwith* v. *Talbot, supra,* 95 U. S. 289, 292; see, also, *Raubitschek* v. *Blank, supra,* 80 N. Y. 478; *Freeland* v. *Ritz,* 154 Mass. 257, 259; *Gall* v. *Brashier,* 169 F. 2d 704, 708–709; 2 Corbin, *op. cit.,* § 512, and cases there cited.)

Turning to the writings in the case before us — the unsigned office memo, the payroll change form initialed by the general manager Johns, and the paper signed by the comptroller Carstens — it is apparent, and most patently, that all three refer on their face to the same transaction. The parties, the position to be filled by plaintiff, the salary to be paid him, are all identically set forth; it is hardly possible that such detailed information could refer to another or a different agreement. Even more, the card signed by Carstens notes

that it was prepared for the purpose of a " Salary increase per contractual arrangements with Miss Arden ". That certainly constitutes a reference of sorts to a more comprehensive " arrangement," and parol is permissible to furnish the explanation.

The corroborative evidence of defendant's assent to the contents of the unsigned office memorandum is also convincing. Prepared by defendant's agent, Miss Arden's personal secretary, there is little likelihood that that paper was fraudulently manufactured or that defendant had not assented to its contents. Furthermore, the evidence as to the conduct of the parties at the time it was prepared persuasively demonstrates defendant's assent to its terms. Under such circumstances, the courts below were fully justified in finding that the three papers constituted the " memorandum " of their agreement within the meaning of the statute.

Nor can there be any doubt that the memorandum contains all of the essential terms of the contract. (See *N. E. D. Holding Co.* v. *McKinley,* 246 N. Y. 40; *Friedman & Co.* v. *Newman,* 255 N. Y. 340.) Only one term, the length of the employment, is in dispute. The September 26th office memorandum contains the notation, " 2 years to make good ". What purpose, other than to denote the length of the contract term, such a notation could have, is hard to imagine. Without it, the employment would be at will (see *Martin* v. *New York Life Ins. Co.,* 148 N. Y. 117, 121), and its inclusion may not be treated as meaningless or purposeless. Quite obviously, as the courts below decided, the phrase signifies that the parties agreed to a term, a certain and definite term, of two years, after which, if plaintiff did not " make good ", he would be subject to discharge. And examination of other parts of the memorandum supports that construction. Throughout the writings, a scale of wages, increasing plaintiff's salary periodically, is set out; that type of arrangement is hardly consistent with the hypothesis that the employment was meant to be at will. The most that may be argued from defendant's standpoint is that " 2 years to make good ", is a cryptic and ambiguous statement. But, in such a case, parol evidence is admissible to explain its meaning. (See *Martocci* v. *Greater New York Brewery,* 301 N. Y. 57, 63; *Marks*

v. *Cowdin, supra,* 226 N. Y. 138, 143–144; 2 Williston, *op. cit.,* § 576; 2 Corbin, *op. cit.,* § 527.) Having in mind the relations of the parties, the course of the negotiations and plaintiff's insistence upon security of employment, the purpose of the phrase — or so the trier of the facts was warranted in finding — was to grant plaintiff the tenure he desired.

The judgment should be affirmed, with costs.

LOUGHRAN, Ch. J., LEWIS, CONWAY, DESMOND, DYE and FROESSEL, JJ., concur.

Judgment affirmed.